NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-southern judicial district
No. 2022-0629


MILES BROWN & a.

v.

SECRETARY OF STATE

Argued: May 11, 2023
Opinion Issued: November 29, 2023


McLane Middleton, P.A., of Manchester (Steven J. Dutton on the brief), Paul Twomey, of Epsom, on the brief, and Elias Law Group LLP, of Seattle, Washington and Washington, D.C. (Abha Khanna, Jonathan P. Hawley, Daniel C. Osher, and Aaron M. Mukerjee on the brief, and Jonathan P. Hawley orally), for the plaintiffs.


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Anthony J. Galdieri, Brendan A. O'Donnell, assistant attorney general, and Matthew G. Conley, attorney, on the brief, and Anthony J. Galdieri orally), for the defendant.

American Civil Liberties Union of New Hampshire Foundation, of Concord (Gilles R. Bissonnette and Henry R. Klementowicz on the brief) and American Civil Liberties Union Foundation, of New York, New York (Julie A. Ebenstein on the brief), as amici curiae.

Sisti Law Offices, of Portsmouth (Alan Cronheim on the brief), and Campaign Legal Center, of Washington, D.C. (Mark P. Gaber, Hayden Johnson, and Allison Walter on the brief), for Campaign Legal Center, as amicus curiae.

DONOVAN, J. This case presents a question of first impression — whether the plaintiffs' claims of extreme partisan gerrymandering are justiciable under the New Hampshire Constitution. The plaintiffs, Miles Brown, Elizabeth Crooker, Christine Fajardo, Kent Hackmann, Bill Hay, Prescott Herzog, Palana Hunt-Hawkins, Matt Mooshian, Theresa Norelli, Natalie Quevedo, and James Ward, appeal an order of the Superior Court (Colburn, J.) granting the motion filed by the defendant, the New Hampshire Secretary of State, to dismiss their complaint seeking declaratory and injunctive relief. In their complaint, the plaintiffs challenge the constitutionality of Laws 2022, chapter 45 and Laws 2022, chapter 46, which, respectively, establish the current boundaries for state senate and executive council districts. They claim that the legislature violated the New Hampshire Constitution by drawing districts that unfairly benefit one political party at the expense of another. The plaintiffs sought a declaration that the districts violate Part I, Articles 1, 10, 11, 12, 22, and 32 of the New Hampshire Constitution and requested that the trial court "[a]dopt plans for New Hampshire's Senate and Executive Council districts that comply with the New Hampshire Constitution." Because we determine that the issue before us raises a non-justiciable political question, we affirm.

I

The record includes the following facts. In 2022, following the 2020 federal census, the legislature enacted laws redistricting New Hampshire's senate and executive council districts. See Laws 2022, ch. 45 (apportioning state senate districts); Laws 2022, ch. 46 (apportioning executive council districts). The plaintiffs are registered New Hampshire voters. They seek both a declaration that the redistricting laws violate the State Constitution and preliminary and permanent injunctive relief enjoining the defendant from "implementing, enforcing, or giving any effect" to the laws. They requested that the trial court "[a]dopt plans . . . that comply with the New Hampshire Constitution" and contended that the senate and executive council plans are

2

the products of impermissible partisan gerrymandering. Specifically, the plaintiffs allege that the plans "unjustifiably impose[] irregularly shaped districts carefully tailored to entrench Republican control" of the senate and the executive council.

The plaintiffs' complaint alleges that the senate and executive council districts violate the New Hampshire Constitution "in three independent ways." First, they assert that the plans violate "the Free and Equal Elections Clause of the New Hampshire Constitution," see N.H. CONST. pt. I, art. 11, "because [the plans] were enacted with impermissible partisan intent—specifically, to prevent Democratic voters from fairly and equally participating in the political process—and will achieve their intended effect." They allege that the plans "are partisan gerrymanders that undermine free and equal elections in New Hampshire by effectuating preordained outcomes without regard to the expressed will of the state's voters."

Second, the plaintiffs claim that the plans violate the State Constitution's "guarantee of equal protection" under Part I, Articles 1, 10, and 12, "because [the plans] dilute the voting strength of Democratic voters and deny them their right to substantially equal votes compared to Republican voters." They allege that, "[t]ogether, these provisions provide a constitutional guarantee of equal protection, which ensures that State law treats groups of similarly situated citizens in the same manner." (Quotation and brackets omitted.) The plaintiffs assert that "all New Hampshire voters are similarly situated in their exercise of the franchise" and "by diluting the voting strength of half of the state's electorate, the Challenged Plans single out New Hampshire voters who support Democratic candidates and treat them differently in a manner that harms their voting strength."

Third, the plaintiffs maintain that the plans violate "the New Hampshire Constitution's guarantees of free speech and association" under Part I, Articles 22 and 32, "because, in enacting these plans, the General Court engaged in viewpoint discrimination by retaliating against Democratic voters based on their political views and diluting their ability to band together and elect candidates of their choice." The plaintiffs allege that the legislature "targeted Democratic voters" based upon "their political views and association with other voters who similarly support Democratic candidates."

Regarding the senate plan, the plaintiffs' complaint alleges that the legislature "'packed' Democratic voters tightly into a small number of districts where they form overwhelming majorities, minimizing their impact—and maximizing Republican voters' impact—in neighboring districts," and then "'cracked' the remaining Democratic voters, distributing them among the vast majority of districts in such a way that those districts are dominated by

3

Republican voters."[1]  According to the plaintiffs, in doing so "the General Court intentionally subordinated traditional redistricting criteria to the predominant purpose of entrenching Republican control in the Senate."  Regarding the executive council plan, the plaintiffs' complaint alleges that the legislature crafted it "to dilute the voting power of Democratic voters and maximize the voting power of Republican voters" by "packing Democratic voters into District 2 and cracking other Democratic voters among the remaining districts . . . such that those districts are more easily winnable by Republican candidates."

The defendant moved to dismiss, arguing that the plaintiffs' claims present non-justiciable political questions "because the text of the State Constitution demonstrably commits the authority to reapportion State Senate and Executive Council districts to the Legislature and the Plaintiffs have not alleged that the Legislature violated any of the mandatory reapportionment requirements set forth in the Constitution."  The defendant also argued that the plaintiffs' claims are non-justiciable political questions "because there are no discoverable and manageable standards for judicial intervention."

The trial court granted the motion to dismiss.  The court reasoned that the clear language of both Part II, Articles 26 and 65 "demonstrates that our State Constitution commits the authority to draw the boundaries for senate and executive councilor districts to the legislature."  (Quotation omitted.)  The court noted that the "plaintiffs do not claim that either of the redistricting plans violate any of the mandatory, express requirements of Article 26 and Article 65," and it rejected the plaintiffs' Part I claims because "none of the Part I articles cited by the plaintiffs have any language concerning redistricting." The court determined that "'[i]n the absence of a clear, direct, irrefutable' violation of" the redistricting requirements in Part II, Articles 26 and 65, "'the complexity in delineating state legislative district boundaries and the political nature of such endeavors necessarily preempt judicial intervention.'"  (Quoting City of Manchester v. Secretary of State, 163 N.H. 689, 697 (2012)). Accordingly, the court concluded, "the only justiciable issues it can address concerning senate and executive council redistricting are whether the newly-enacted districts meet the express requirements of [Part II,] Articles 26 and 65." Because the trial court found that the districts meet those requirements, the court declined to consider the plaintiffs' challenge to the constitutionality of the districts "based on claims of excessive political gerrymandering as such claims present non-justiciable political questions."  This appeal followed.

---

[1] As characterized by the plaintiffs, a voting district is "cracked" when a party's supporters are divided among multiple districts so that they fall short of a majority in each.  A voting district is "packed" when a party's supporters are highly concentrated to ensure that the party wins by a large margin, thereby "wasting" votes that would improve their chances of winning in other voting districts.  See Gill v. Whitford, 138 S. Ct. 1916, 1924 (2018).

## II

On appeal, the plaintiffs argue that the trial court "made three fundamental errors" in concluding that partisan-gerrymandering claims are non-justiciable under the State Constitution. First, they assert that the trial court "misconstrued the political-question doctrine, conflating ordinary judicial review of enacted legislation for compliance with constitutional rights . . . with judicial usurpation of the legislative process of drawing districts in the first instance." According to the plaintiffs, "a court neither usurps the Legislature's redistricting authority nor injects its own political judgments into the process by adjudicating a claim that the party in control of the Legislature has intentionally drawn a plan to distort the democratic process and reduce the voting strength of particular voters who might oppose its candidates."

Second, the plaintiffs assert that the trial court "misread the express requirements for Senate and Executive Council plans found in Part II, Articles 26 and 65 to preclude claims that those plans violate separate rights found in Part I." They argue that we have "never suggested that, in exercising [its] primary redistricting authority, the Legislature enjoys unchecked power to run roughshod over voters' Part I rights." The plaintiffs reason that, "just as the House's exclusive authority under Part II, Article 22 to write its own rules does not preclude courts from entertaining claims that those rules violate Part I rights, . . . neither does the Legislature's authority to draw Senate and Executive Council plans under Part II, Articles 26 and 65." (Citing Burt v. Speaker, N.H. House of Representatives, 173 N.H. 522, 528 (2020)).

Third, the plaintiffs assert that the trial court "erroneously concluded it lacked power to hear [their] claims because 'none of the Part I articles cited by the plaintiffs have any language concerning redistricting.'" They argue that, to the contrary, "[p]artisan gerrymandering directly conflicts with the free-and-equal elections, equal-protection, free-speech, and free-association rights protected by Part I of the State Constitution."

In addition, the plaintiffs maintain that we should reject the defendant's argument that partisan-gerrymandering claims cannot be resolved in the absence of judicially discoverable and manageable standards for resolution. They observe that decisions by other state courts "offer various standards by which a partisan-gerrymandering claim can be manageably adjudicated." Nonetheless, "[i]n the event this Court harbors serious concerns that Plaintiffs' claims may not give rise to discoverable and manageable standards," the plaintiffs suggest that we "should remand this case to the Superior Court for development and consideration of an evidentiary record rather than preemptively decide the issue based on speculation about what that record might be."

5

The defendant counters that the plaintiffs' claims present non-justiciable political questions because the State Constitution vests the legislature with the exclusive authority to redistrict. According to the defendant, the State Constitution "does not contain any mandatory requirements or 'constitutional guideposts' requiring the Legislature to take, or prohibiting it from taking, political considerations into account during the reapportionment process." Nor, the defendant argues, does the State Constitution require, "as the plaintiffs assert," that the legislature "use only 'nonpartisan, traditional redistricting criteria'" or prohibit the legislature "from considering political criteria when exercising its constitutional authority to reapportion."

The defendant also argues that the plaintiffs' claims are non-justiciable political questions because the State Constitution does not provide discoverable and manageable standards for judicial intervention. Given that the State Constitution contains no "guidelines or prohibitions relating to political considerations in redistricting," the defendant asserts that this court is "in the same position as" the United States Supreme Court was when it rejected a partisan-gerrymander claim as non-justiciable in Rucho v. Common Cause, 139 S. Ct. 2484 (2019). Accordingly, the defendant contends, "[a]s was the case in Rucho, this Court should not judicially review an allegation of political gerrymandering when there are no state laws or constitutional provisions setting forth one or more standards that would allow the Court to render principled, rational, and reasoned decisions based on those constitutional or statutory standards."

III

The challenged statutes establishing the current boundaries for state senate and executive council districts are presumed to be constitutional, and we will not declare them invalid except upon inescapable grounds. See City of Manchester, 163 N.H. at 696. This presumption requires that we uphold the constitutionality of the statutes unless a clear and substantial conflict exists between them and the constitution. See id. It also means that when doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality. Id. "Courts generally defer to legislative enactments not only because they represent the duly enacted and carefully considered decision of a coequal and representative branch of our Government, but also because the legislature is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." Id. (quotations and citation omitted).

IV

We begin, as we must, by addressing the jurisdictional question. Courts lack jurisdiction to decide political questions. Richard v. Speaker of the House

6

of Representatives, 175 N.H. 262, 267 (2022).  Whether a controversy is non-justiciable because it involves a political question presents a question of law, which we review de novo.  See Burt, 173 N.H. at 525.

The justiciability of a political question derives from the principle of separation of powers, as set forth in Part I, Article 37 of the State Constitution.  Id.  The justiciability doctrine prevents judicial violation of the separation of powers by limiting judicial review of certain matters that lie within the province of the other two branches of government.  Id.  If a question is not justiciable, it is not ours to review.  Baines v. N.H. Senate President, 152 N.H. 124, 128 (2005).

"Deciding whether a matter has in any measure been committed by the Constitution to another branch of government is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as [the final] interpreter of the [State] Constitution.'"  Hughes v. Speaker, N.H. House of Representatives, 152 N.H. 276, 283 (2005) (quoting Baker v. Carr, 369 U.S. 186, 211 (1962) (ellipsis omitted)).  When there is such a commitment, we must decline to adjudicate the matter to avoid encroaching upon the powers and functions of a coordinate political branch.  Burt, 173 N.H. at 525.  However, concluding that the State Constitution commits to a coordinate branch of government certain exclusive authority does not necessarily end the justiciability inquiry.  Richard, 175 N.H. at 268.  "When the question presented is whether or not a violation of a mandatory constitutional provision has occurred, it is not only appropriate to provide judicial intervention, we are mandated to do no less."  Id. (quotation and brackets omitted).  Here, the plaintiffs have not identified any mandatory constitutional provisions that provide a textual basis for resolving the claims before us.  Cf. City of Manchester, 163 N.H. at 696 (rejecting a challenge to a law redistricting voting districts for the New Hampshire House of Representatives claiming violations of the mandatory provisions of Part II, Article 11 of the State Constitution).

V

"A controversy is nonjusticiable — i.e., involves a political question — where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it."  Burt, 173 N.H. at 525 (quotation omitted).  In Burt v. Speaker, New Hampshire House of Representatives, we concluded that a challenge to the constitutionality of a house rule banning deadly weapons from the house chamber was justiciable, despite the fact that the State Constitution demonstrably commits to the house of representatives the authority to enact its own internal rules of proceedings.  Id. at 524-25.  We determined that the claim was justiciable in that case because it involved a mandatory constitutional right — the fundamental right to keep and bear arms

7

under Part I, Article 2-a of the New Hampshire Constitution. Id. at 528. Although we declined to reach the merits of the constitutional challenge, we observed that our substantive due process "reasonableness test" was applicable to the regulation of the right to bear arms. Id.; see Bleiler v. Chief, Dover Police Dep't, 155 N.H. 693, 699-700 (2007). In contrast, as explained below, both components of a non-justiciable political question are present in this case. First, the New Hampshire Constitution contains a textually demonstrable commitment to redistrict to the legislature, N.H. CONST. pt. II, arts. 26, 65, and the plaintiffs do not contend that the district plans at issue implicate either of those mandatory constitutional provisions. Second, the plain text of the specific provisions invoked by the plaintiffs under Part I of the New Hampshire Constitution contains no judicially discernible and manageable standards for adjudicating claims of extreme partisan gerrymandering. N.H. CONST. pt. I, arts. 1, 10, 11, 12, 22, 32.

A

The New Hampshire Constitution commits the authority to redistrict to the legislature. See N.H. CONST. pt. II, arts. 26, 65. In 1964, our founding document was amended to require the legislature to redistrict senate districts at the regular session following every federal decennial census. Below v. Secretary of State, 148 N.H. 1, 3 (2002) (Below I); see N.H. CONST. pt. II, art. 26. Part II, Article 25 provides that "[t]he senate shall consist of twenty-four members." N.H. CONST. pt. II, art. 25. Part II, Article 26 provides "that the state may be equally represented in the senate, the legislature shall divide the state into single-member districts, as nearly equal as may be in population, each consisting of contiguous towns, city wards and unincorporated places, without dividing any town, city ward or unincorporated place." N.H. CONST. pt. II, art. 26. Regarding the executive council, Part II, Article 60 provides that "[t]here shall be biennially elected, by ballot, 5 councilors, for advising the governor in the executive part of government." N.H. CONST. pt. II, art. 60. Pursuant to Part II, Article 65, "[t]he legislature may . . . divide the state into five districts, as nearly equal as may be, governing themselves by the number of population, each district to elect a councilor." N.H. CONST. pt. II, art. 65. The plaintiffs do not contend that the legislature failed to comply with any of these mandatory constitutional requirements.

"'[A] state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality.'" Below I, 148 N.H. at 5 (quoting Connor v. Finch, 431 U.S. 407, 414-15 (1977)). Courts "possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name." Id. (quotation omitted). "It is primarily the Legislature, not this Court, that must make the necessary compromises to effectuate state constitutional goals and statutory policies within the

limitations imposed by federal law." City of Manchester, 163 N.H. at 697 (quotation and brackets omitted). Thus, "we tread lightly in this political arena, lest we materially impair the legislature's redistricting power." Petition of Below, 151 N.H. 135, 150 (2004) (Below II). Judicial relief in the form of newly drawn districts becomes appropriate only when a legislature fails to reapportion according to constitutional requisites in a timely fashion after having had an adequate opportunity to do so. Id. at 151.

The people entrust this decennial exercise to the legislative branch because "the give-and-take of the legislative process," involving as it does representatives elected by the people to make necessary political and policy decisions, "is preferable to any other." Id. at 150 (quotations omitted); see N.H. CONST. pt. II, arts. 26, 65. We have noted that, in redistricting, the legislature may take into account political considerations, including drawing maps to seek partisan advantage. Below I, 148 N.H. at 11. For example, in Below I, the senate president urged this court to reject a proposed senate redistricting plan because it "artificially divide[d]" certain cities "for partisan political advantage" and some districts were "oddly shaped and [were] not comprised of contiguous territory for the sole purpose of protecting Democrat[ic] incumbents and targeting Republican incumbents." Id. We noted that both the senate president's proposed plans and the senate's proposed plan also "embod[ied] political considerations" and sought "partisan advantage." Id. at 12. We rejected each of those plans because "while these types of political considerations may be permissible in legislatively-implemented redistricting plans, they have no place in a court-ordered remedial plan." Id.

Ultimately, we determined that the submitted plans were inappropriate for adoption by the court because each plan had "calculated partisan political consequences (the details of which [were] unknown)" and because we had "no principled way to choose among the plans, especially knowing that we would be endorsing an unknown but intended political consequence by the choice" we made. Id. at 13 (quotations and brackets omitted); see Burling v. Speaker of the House, 148 N.H. 143, 144-45 (2002) (in devising a court-ordered reapportionment plan "[i]t is not our function to decide the peculiarly political questions involved in reapportionment" and, thus, unlike the legislature, "[w]e are indifferent to political considerations, such as incumbency or party affiliation" (quotation omitted)).

Given that redistricting is a "purely political, legislative process," Below II, 151 N.H. at 150 (quotation omitted), the circumstances under which we have intervened in that process have been assiduously limited. When faced with the legislature's failure to act in accordance with its constitutional duty to redistrict, we have been required to reapportion the house and senate in order to protect the people's constitutional right to one person/one vote — the principle which ensures "that the vote of any citizen is approximately equal in

9

weight to that of any other citizen in the State." See Burling, 148 N.H. at 144, 150 (quotation omitted) (house districts); Below I, 148 N.H. at 3 (senate districts).

In addition, we have addressed a challenge to whether the legislature's redistricting plan complied with the mandatory constitutional requirements set forth in Part II of the State Constitution. See City of Manchester, 163 N.H. at 696, 708 (rejecting a claim that a house of representatives plan violated Part II, Article 11 because it: (1) failed to provide approximately 62 towns, wards, and places with their own representatives; (2) divided certain cities, towns, and wards; and (3) devised multi-member districts comprised of towns, wards, and places that were not contiguous); cf. Richard, 175 N.H. at 268, 278 (explaining that, to the extent the legislature is vested with the discretion to take certain actions, a challenge to the manner in which such discretion is exercised is a non-justiciable political question). We have also been required to undertake congressional redistricting upon a demonstrated legislative impasse. See Norelli v. Sec'y of State, 175 N.H. 186, 190 (2022).

When presented with a challenge to duly enacted district plans, we have no mandate "to compromise sometimes conflicting state apportionment policies in the people's name." Below I, 148 N.H. at 5 (quotation omitted). Accordingly, our authority is limited to determining whether the legislature has effected "a clear, direct, irrefutable constitutional violation." City of Manchester, 163 N.H. at 697, 704 (explaining that "[b]oth the complexity in delineating state legislative district boundaries and the political nature of such endeavors necessarily preempt judicial intervention in the absence of a clear, direct, irrefutable constitutional violation"; "policy decision[s]" are reserved for the legislature; and we "simply cannot micromanage all the difficult steps the legislature must take in performing the high-wire act that is legislative district drawing" (quotations and brackets omitted)).

B

As explained above, the New Hampshire Constitution commits the duty to redistrict to the legislature, and the plaintiffs do not assert that, in enacting the statutes setting forth the state senate and executive council districts at issue, the legislature violated the mandatory redistricting requirements of Part II, Articles 26 and 65. Therefore, we next consider whether the constitutional provisions in Part I of the New Hampshire Constitution relied upon by the plaintiffs contain discernible and manageable standards to direct judicial decisionmaking in the context of claims of extreme partisan gerrymandering. We conclude that no such standards exist.

At the outset we reiterate that the plaintiffs do not identify any mandatory constitutional provisions which govern their partisan-

gerrymandering claims.  Moreover, the plaintiffs do not expressly argue that any degree of partisan gerrymandering is impermissible.  Rather, they allege that the "Challenged Plans are extreme partisan outliers."  Thus, the question we face is whether the New Hampshire Constitution includes an express or discernible standard with respect to extreme partisan gerrymandering.  See Hughes, 152 N.H. at 286, 288 (determining that a claim regarding compliance with Part I, Article 8's mandatory requirement that "the public's right of access to governmental proceedings and records shall not be unreasonably restricted" is justiciable because "[a] legislative determination whether restrictions to public access are 'reasonable' is subject to judicially discoverable and manageable standards" (quotation omitted)); Burt, 173 N.H. at 524, 528 (determining that whether a house rule prohibiting the carrying or possession of any deadly weapon in Representatives Hall violates the fundamental right to keep and bear arms under Part I, Article 2-a of the State Constitution is justiciable, noting that a "reasonableness test" for evaluating substantive due process challenges to such regulations exists (quotation omitted)).

This particular inquiry requires that we start with the text of the New Hampshire Constitution itself.  The state constitutional provisions relied upon by the plaintiffs are: Part I, Article 1 ("All men are born equally free and independent:  Therefore, all government, of right, originates from the people, is founded in consent, and instituted for the general good."); Part I, Article 10 ("Government being instituted for the common benefit, protection, and security, of the whole community, and not for the private interest or emolument of any one man, family, or class of men; therefore, whenever the ends of government are perverted, and public liberty manifestly endangered, and all other means of redress are ineffectual, the people may, and of right ought to reform the old, or establish a new government."); Part I, Article 11 ("All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election."); Part I, Article12 ("Every member of the community has a right to be protected by it, in the enjoyment of his life, liberty, and property; he is therefore bound to contribute his share in the expense of such protection, and to yield his personal service when necessary."); Part I, Article 22 ("Free speech and liberty of the press are essential to the security of freedom in a state: They ought, therefore, to be inviolably preserved."); Part I, Article 32 ("The people have a right, in an orderly and peaceable manner, to assemble and consult upon the common good, give instructions to their representatives, and to request of the legislative body, by way of petition or remonstrance, redress of the wrongs done them, and of the grievances they suffer.").  These provisions neither expressly address partisan gerrymandering nor articulate discernible and manageable standards for adjudicating claims related to partisan gerrymandering.

Furthermore, unlike other states that have codified limits on partisan gerrymandering or amended their state constitutions to limit or prohibit

11

partisan favoritism in redistricting, New Hampshire has not done so.  See, e.g., ARIZ. CONST. art. IV, pt. 2, § 1; CAL. CONST. art. XXI, § 2(e); COLO. CONST. art. V, §§ 44, 46; FLA. CONST. art. III, § 20(a); HAW. CONST. art. 4, § 6; MICH. CONST. art. IV, § 6; MO. CONST. art. III, § 3; N.Y. CONST. art. III, § 4; OHIO CONST. art. XI, § 6; VA. CONST. art. II, § 6-A; WASH. CONST. art. II, § 43(5); Del. Code Ann. tit. xxix, § 804 (2023); Iowa Code § 42.4(5) (2023); Mont. Code Ann. § 5-1-115(3) (2021); 2021 Neb. Laws 1711-13; Or. Rev. Stat. § 188.010(2) (2021).

Next, we consider the extent to which other courts construing other constitutions have determined that their founding documents articulate judicially manageable standards for the adjudication of extreme partisan-gerrymandering claims.  We start with the United States Supreme Court's consideration of whether partisan gerrymandering is justiciable under the Federal Constitution.  In Rucho v. Common Cause, the Court concluded that there is "no plausible grant of authority" for judicial oversight of partisan gerrymandering under the Federal Constitution.  Rucho, 139 S. Ct. at 2507.  The majority of the Court also determined that there were "no legal standards to limit and direct [courts'] decisions."  Id.  Although in the case before us the plaintiffs allege that partisan gerrymandering violates our State Constitution, we find the Supreme Court's reasoning persuasive because the plaintiffs here make arguments similar to those addressed in Rucho.

In Rucho, the Court considered two cases arising from North Carolina and Maryland in which plaintiffs challenged their states' congressional districting maps as unconstitutional partisan gerrymanders.  Rucho, 139 S. Ct. at 2491.  "The North Carolina plaintiffs complained that the State's districting plan discriminated against Democrats; the Maryland plaintiffs complained that their State's plan discriminated against Republicans."  Id.  In the North Carolina case, the plaintiffs raised claims that "excessive" partisan gerrymandering violated, among other things, the Equal Protection Clause of the Fourteenth Amendment by "intentionally diluting the electoral strength of Democratic voters," and violated their First Amendment rights to free speech and freedom of association "by retaliating against supporters of Democratic candidates on the basis of their political beliefs."  Id. at 2491-93.  In the Maryland case, the plaintiffs raised claims that the redistricting plan violated the First Amendment, and the trial court agreed, concluding that the plan diminished Republican voters' "ability to elect their candidate of choice because of their party affiliation and voting history, and by burdening their associational rights."  Id. at 2493 (quotation omitted).

Notably, Chief Justice Roberts observed that each of the districting plans at issue in Rucho was "highly partisan, by any measure."  Id. at 2491.  However, at the outset the Court observed that "[p]artisan gerrymandering claims have proved far more difficult to adjudicate" than other types of

redistricting issues, like one-person, one-vote and racial gerrymandering, because "while it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting, a jurisdiction may engage in constitutional political gerrymandering." Id. at 2497 (quotation omitted). Because some level of partisan gerrymandering is constitutional, the Court recognized that "[t]he 'central problem'" with partisan-gerrymandering claims is "'determining when political gerrymandering has gone too far.'" Id. (quoting Vieth v. Jubelirer, 541 U.S. 267, 296 (2004) (plurality opinion)).

Thus, the Court determined, addressing the "threshold question[]" of whether partisan-gerrymandering claims are justiciable requires answering the question of how to provide "a standard for deciding how much partisan dominance is too much." Id. at 2498 (quotations omitted). In such circumstances, the Court noted, it is "vital" that such a standard be "especially clear" because "[w]ith uncertain limits, intervening courts—even when proceeding with best intentions—would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust." Id. (quotation omitted). As the Court explained, "the opportunity to control the drawing of electoral boundaries through the legislative process of apportionment is a critical and traditional part of politics in the United States. An expansive standard requiring the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process." Id. (quotations, brackets, and internal citations omitted). Accordingly, courts "must be armed with a standard that can reliably differentiate unconstitutional from constitutional political gerrymandering." Id. at 2499 (quotation omitted).

"Partisan gerrymandering claims rest on an instinct that groups with a certain level of political support should enjoy a commensurate level of political power and influence." Id. "Explicitly or implicitly, a districting map is alleged to be unconstitutional because it makes it too difficult for one party to translate statewide support into seats in the legislature." Id. As the Court recognized, however, "such a claim is based on a norm that does not exist in our electoral system—statewide elections for representatives along party lines." Id. (quotations omitted).

When assessing the plaintiffs' claims, the Rucho Court observed that nothing in the Federal Constitution mandates outright proportional representation, and, therefore, "plaintiffs inevitably ask the courts to make their own political judgment about how much representation particular political parties deserve—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end." Id. Thus, partisan-gerrymandering claims essentially ask courts to "apportion political power as a matter of fairness." Id. However, the Court observed, the "initial difficulty in settling on a clear, manageable and politically neutral test for fairness is that it

13

is not even clear what fairness looks like in this context." Id. at 2500 (quotation omitted). "Fairness" could mean applying a test to increase the number of competitive districts by "undo[ing] packing and cracking so that supporters of the disadvantaged party have a better shot at electing their preferred candidates." Id. Or, it could mean employing a test that ensures each party wins "its appropriate share of safe seats." Id. (quotations omitted). The Court concluded that

> [d]eciding among just these different visions of fairness . . . poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral. Any judicial decision on what is "fair" in this context would be an "unmoored determination" of the sort characteristic of a political question beyond the competence of the federal courts.

Id. (quoting Zivotofsky v. Clinton, 566 U.S. 189, 196 (2012)).

The Court disagreed with the plaintiffs that, because courts can adjudicate one-person, one-vote claims, they can assess partisan-gerrymandering claims. Id. at 2501. As the Court explained, while the one-person, one-vote rule "is relatively easy to administer as a matter of math," the same "cannot be said of partisan gerrymandering claims, because the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly." Id. According to the Court, "[i]t hardly follows from the principle that each person must have an equal say in the election of representatives that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide support." Id.

> More fundamentally, "vote dilution" in the one-person, one-vote cases refers to the idea that each vote must carry equal weight. In other words, each representative must be accountable to (approximately) the same number of constituents. That requirement does not extend to political parties. It does not mean that each party must be influential in proportion to its number of supporters.

Id. (emphasis added). As the Court reasoned, its "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," not "generalized partisan preferences." Id. (quotations omitted).

Given that the Court could discern no manageable standard in the Federal Constitution, it looked to the political science-based tests proposed by

14

the plaintiffs but found them lacking because they were ineffective at predicting future election results. Id. at 2503-04. As the Court observed,

> [e]ven the most sophisticated districting maps cannot reliably account for some of the reasons voters prefer one candidate over another, or why their preferences may change. Voters elect individual candidates in individual districts, and their selections depend on the issues that matter to them, the quality of the candidates, the tone of the candidates' campaigns, the performance of an incumbent, national events or local issues that drive voter turnout, and other considerations. Many voters split their tickets. Others never register with a political party, and vote for candidates from both major parties at different points during their lifetimes. For all of those reasons, asking judges to predict how a particular districting map will perform in future elections risks basing constitutional holdings on unstable ground outside judicial expertise.

Id.

The Court observed that although "[e]xcessive partisanship in districting leads to results that reasonably seem unjust," that supposition "does not mean that the solution lies with the . . . judiciary." Id. at 2506. Because there is "no plausible grant of authority in the Constitution, and no legal standards to limit and direct [courts'] decisions," the Court held that partisan-gerrymandering claims are non-justiciable. Id. at 2506-07. The Court underscored that it had "never struck down a partisan gerrymander as unconstitutional—despite various requests over the past 45 years" and that "[t]he expansion of judicial authority would not be into just any area of controversy, but into one of the most intensely partisan aspects of American political life." Id. at 2507.

> That intervention would be unlimited in scope and duration—it would recur over and over again around the country with each new round of districting, for state as well as federal representatives. Consideration of the impact of today's ruling on democratic principles cannot ignore the effect of the unelected and politically unaccountable branch of the Federal Government assuming such an extraordinary and unprecedented role.

Id.

The reasoning employed by the majority of the Rucho Court in determining whether there is a judicially discernible and manageable standard for resolving claims of partisan gerrymandering under the Federal Constitution is directly on point with respect to the plaintiffs' claims under the New

15

Hampshire Constitution. The plaintiffs acknowledge that their "equal-protection, free-speech, and free-assembly claims under the State Constitution resemble at face value those made under parallel provisions of the federal document in Rucho." (Quotation omitted.) As we have observed, the Supreme Court has, however, discerned no manageable standard in the Federal Constitution for resolving partisan-gerrymandering claims under such "parallel provisions."

The plaintiffs argue that, instead of relying upon the reasoning in Rucho, we should look to other state courts "interpreting analogous constitutional provisions" for guidance on the issue of the manageability of partisan-gerrymandering claims. According to the plaintiffs, relying upon Rucho "ignores the Rucho majority's explicit call for state judiciaries to assume the mantle of policing impermissible partisan gerrymandering."

We disagree with the plaintiffs' reading of the Supreme Court's discussion of the role of state courts in this area. After concluding that "partisan gerrymandering claims present political questions beyond the reach of the federal courts," the Court noted that "[t]he States . . . are actively addressing the issue" of partisan gerrymandering "on a number of fronts," and it acknowledged that "[p]rovisions in state statutes and state constitutions can provide standards and guidance for state courts to apply." Rucho, 139 S. Ct. at 2506-07 (emphasis added). In other words, the Court simply observed that the solution to partisan gerrymandering in redistricting may be addressed through the legislative process. Indeed, as the Supreme Court expressly noted, "numerous . . . States are restricting partisan considerations in districting through legislation," some "by placing power to draw electoral districts in the hands of independent commissions," others by "outright prohibit[ing] partisan favoritism in redistricting." Id. at 2507-08. New Hampshire has no such constitutional or statutory provisions.

Further, we are not persuaded by the plaintiffs' assertion that "other state courts' decisions confirm that" a discernible standard for adjudicating partisan-gerrymandering claims can be found in our constitution. In support of that assertion, the plaintiffs prominently rely upon a North Carolina case, Harper v. Hall, 868 S.E.2d 499 (N.C. 2022) (Harper I), which was recently overruled by the North Carolina Supreme Court.[2] See Harper v. Hall, 886 S.E.2d 393 (N.C. 2023) (Harper III). The North Carolina Supreme Court's experience attempting to identify manageable standards for adjudicating partisan-gerrymandering claims is telling.

---

[2] In their brief, the plaintiffs assert, without support, that New Hampshire's history is "aligned" with North Carolina's history.

In Harper I, the court held that the plaintiffs' claims that redistricting plans for state and federal elections constituted partisan gerrymanders in violation of the free elections, equal protection, free speech, and freedom of assembly clauses of the North Carolina Constitution were justiciable. Harper I, 868 S.E.2d at 527-28. The court found that there were "several manageable standards for evaluating the extent to which districting plans dilute votes on the basis of partisan affiliation." Id. at 551. The court determined that certain political science metrics, specifically the mean-median difference analysis and efficiency gap analysis, could serve as a sufficient standard to demonstrate whether a redistricting map is "presumptively constitutional." Id. at 547-48. The court indicated that a 1% or less mean-median difference score and a 7% or less efficiency gap score could serve as thresholds of constitutionality. Id. at 548. The court declined, however, to delineate a precise standard, reasoning that on remand the trial court would "work out more concrete and specific standards for evaluating state legislative apportionment schemes in the context of actual litigation." Id. at 547 (quotation omitted).

On remand, a three-judge panel, with the assistance of three special masters and four "advisors," considered three remedial redistricting plans submitted by the legislature by employing the mean-median difference and the efficiency gap metrics endorsed by the court in Harper I. Harper v. Hall, 881 S.E.2d 156, 160, 165-70 (N.C. 2022) (Harper II). The panel found that the remedial house plan (RHP) and the remedial senate plan (RSP) complied with Harper I, whereas the remedial congressional plan (RCP) did not because it did not score below the relevant thresholds on the political science metrics that the Harper I Court had identified. Harper III, 886 S.E.2d at 407.

On appeal, the court affirmed the panel's rejection of the RCP and its approval of the RHP but it reversed the panel's approval of the RSP. Harper II, 881 S.E.2d at 176-78. Although the court determined that the RSP complied with the standards articulated in Harper I, because "[c]onstitutional compliance is not grounded in narrow statistical measures, but in broad fundamental rights," the court reasoned that "a trial court reviewing the constitutionality of a challenged proposed districting plan must assess whether that plan upholds the fundamental right of the people to vote on equal terms and to substantially equal voting power." Id. at 174, 178-79. According to the court, while Harper I mentioned "several potential datapoints that may be used in assessing the constitutionality of a proposed districting plan," a trial court "may not simply find that a districting plan meets certain factual, statistical measures and therefore dispositively, legally conclude based on those measures alone that the plan is constitutionally compliant." Id. at 174 (emphasis omitted).

The court subsequently granted rehearing to address whether the standards set forth in Harper I and Harper II were manageable. Harper III, 886

S.E.2d at 399-400.  In doing so, the court recognized that the "vague and inconsistent standards" described in Harper I "are not derived from any express provision in the constitution," and that "the selected tests and corresponding scores . . . [had] proved insufficient as a clear and manageable standard."  Id. at 424-25.  The court reasoned that "during the remedial phase of [the] case, no one—not even the four justices who created it—could apply [the standard] to achieve consistent results," thereby demonstrating that "neither the criteria created in Harper I nor [the North Carolina Constitution] provide a judicially discoverable or manageable standard to address claims of partisan gerrymandering."  Id. at 426.

VI

Here, the plaintiffs have failed to identify any express mandatory constitutional provision or state statute addressing partisan gerrymandering in New Hampshire.  Further, we are not persuaded that a discernible standard for adjudicating partisan-gerrymandering claims exists.  Indeed, it is notable that, despite "struggl[ing] without success over the past several decades to discern judicially manageable standards for deciding such claims," the United States Supreme Court was unable to do so.  Rucho, 139 S. Ct. at 2491.  Even when a majority of the Court found that a claim of purely partisan gerrymandering was justiciable in the context of an Equal Protection claim, it splintered over the proper standard to apply.  See Davis v. Bandemer, 478 U.S. 109 (1986) (plurality opinion), abrogated by Rucho, 139 S. Ct. 2484.

In Bandemer, four Justices proposed a standard that required proof of "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group."  Id. at 127 (opinion of White, J.).  Two Justices focused on "whether the boundaries of the voting districts have been distorted deliberately and arbitrarily to achieve illegitimate ends."  Id. at 165 (Powell, J., concurring in part and dissenting in part).  Meanwhile, three other Justices concluded that the Equal Protection Clause simply "does not supply judicially manageable standards for resolving purely political gerrymandering claims."  Id. at 147 (O'Connor, J., concurring in judgment).  Ultimately, no majority of the Court could discern a "standard that properly should be applied in determining whether a challenged redistricting plan is an unconstitutional partisan political gerrymander."  Id. at 185 n.25 (Powell, J., concurring in part and dissenting in part).  Consequently, the Court held that the plaintiffs had failed to show that the challenged plan violated the Federal Constitution.  Id. at 113.

Despite this tortured history, the plaintiffs contend that, in the event we "harbor[] serious concerns" that their claims may not be susceptible to discoverable and manageable standards, we "should remand this case to the Superior Court for development and consideration of an evidentiary record

18

rather than preemptively decide the issue based on speculation about what that record might be." However, they offer no persuasive argument that the litigation process, as opposed to the legislative process, will lead to defined, manageable and consistent standards by which to measure allegedly unconstitutional partisan gerrymandering. See City of Manchester, 163 N.H. at 696 (explaining that we "generally defer to legislative enactments not only because they represent the duly enacted and carefully considered decision of a coequal and representative branch of our Government, but also because the legislature is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions" (quotations and citation omitted)). Against the judiciary's decades-long inability to identify standards — including the United States Supreme Court and, most recently, the North Carolina Supreme Court — we need not "speculat[e] about what that record might" look like. Moreover, simply remanding this issue to the trial court without setting forth with clarity the applicable principles of law would be an abdication of our duty "to say what the law is." Saloshin v. Houle, 85 N.H. 126, 131 (1931).

VII

The dissent finds that the plain language of Part I, Article 11 of the New Hampshire Constitution "'mandates that all voters have an equal opportunity to translate their votes into representation'" and that, therefore, the plaintiffs' partisan-gerrymandering claim is cognizable under the State Constitution. (Quoting League of Women Voters v. Commonwealth, 178 A.3d 737, 804 (Pa. 2018).) The dissent posits that: (1) because at its adoption in 1784 Part I, Article 11 provided that "All elections ought to be free, and every inhabitant of the State, having the proper qualifications, has equal right to elect and be elected into office"; and (2) because the Pennsylvania Supreme Court has reasoned that the language of Article I, Section 5 of the Pennsylvania Constitution that "Elections shall be free and equal" means elections must "guarantee[], to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government"; and (3) because the North Carolina Supreme Court at one time determined that the language of Article 10, Section 10 of the North Carolina Constitution that "All elections shall be free" means "those in power shall not attain electoral advantage through the dilution of votes"; then (4) the framers of the New Hampshire Constitution must have meant that Part I, Article 11 "mandates that all voters have an equal opportunity to translate their votes into representation"; and (5) therefore, partisan gerrymandering violates the "essential meaning" of Part I, Article 11 "because it dilutes the votes of those who in prior elections voted for the party not in power to give the party in power a lasting electoral advantage." (Quotations omitted.)

19

In adopting this novel interpretation of the New Hampshire Constitution, the dissent fails to employ the substantive analytical framework that applies when we construe a constitutional provision. Rather than simply reciting the text and subsequent amendments of a constitutional provision, our framework requires that we assess not only "the natural significance of the words used by the framers," but also the historical context in which the language was used in light of the circumstances surrounding its formulation in New Hampshire. State v. Mack, 173 N.H. 793, 801 (2020).

> Reviewing the history of the constitution and its amendments is often instructive, and in so doing, it is the court's duty to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in light of the surrounding circumstances. The language used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted.

> Additionally, when interpreting the New Hampshire Constitution, we often look to interpretations of comparable state and federal constitutional provisions in order to inform and guide our analysis. Interpretations by other courts are most persuasive when the language of the constitutional provision at issue is similar to the wording in our constitution. When the constitutional provision at issue contains language dissimilar to ours, interpretations by other courts are of more limited value.

Id. at 801-02 (quotations, citations and brackets omitted).

Other than reviewing dictionary definitions of "to elect," "equal," and "free," and reciting a variety of amendments to Part I, Article 11 which have no bearing on the issue before us, the dissent offers no New Hampshire-based historical evidence that explains what the people of New Hampshire intended the plain language to mean in 1784 when the original New Hampshire Constitution was adopted. See Mack, 173 N.H. at 801.

Without providing any historical context, the dissent concludes that the references to "all elections" being "free" and "every inhabitant" having an "equal right to vote" is "indicative of the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted and conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government." (Quotations omitted.) However,

20

when Part I, Article 11 was adopted in 1784, the "proper qualifications" to vote limited the franchise to male inhabitants twenty-one years of age and older who paid a poll tax.  N.H. CONST. pt. I, art. 11, pt. II, reprinted in The New Hampshire Manual of Useful Information 42, 48 (1889) (The New Hampshire Manual); see Barker v. Young, 80 N.H. 447, 448 (1922).  Thus, the dissent's broad reading of Part I, Article 11 is at odds with historical evidence of what the framers intended the words to mean at the time the constitution was adopted or by subsequent amendment.  See Mack, 173 N.H. at 801-02.  To constitute a principled interpretation of Part I, Article 11, the one posited by the dissent would require "very strong evidence" of historical support.  Barker, 80 N.H. at 449.  But our colleagues offer none.

Rather than reviewing New Hampshire history to reach its conclusion that Part I, Article 11 mandates that all voters have an equal opportunity to translate their votes into partisan representation, the dissent relies on a provision in the Pennsylvania Constitution that does not include language similar to the wording in our constitution to support its further conclusion that partisan-gerrymandering claims are justiciable.  Although our colleagues characterize Article I, Section 5 of the Pennsylvania Constitution as being "analogous" to Part I, Article 11 of the New Hampshire Constitution, it plainly is not.  Adopted in 1784, Part I, Article 11 originally provided that "All elections ought to be free, and every inhabitant of the State, having the proper qualifications, has equal right to elect and be elected into office."  N.H. CONST. pt. I, art. 11, reprinted in The New Hampshire Manual, supra at 42.  In its current form, Part I, Article 11 provides in pertinent part that "All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election."  N.H. CONST. pt. I, art. 11.  By contrast, the Pennsylvania Constitution provides that "Elections shall be free and equal."  PA. CONST. art. I, § 5.  On its face, the plain language of the Pennsylvania Constitution is not "analogous" to Part I, Article 11.

Indeed, the Pennsylvania Supreme Court does not consider Part I, Article 11 to be "analogous" to the Pennsylvania Constitution.  As that court explained, the Pennsylvania Constitution of 1789 "became the first constitution to utilize" the "'and equal' language" and that "[l]ike Pennsylvania, a number of other states go further than merely recognizing the right to vote, and provide additional and independent protections through provisions in their constitutions guaranteeing that their elections shall be 'free and equal,'" identifying Arizona, Arkansas, Delaware, Illinois, Indiana, Kentucky, Oklahoma, Oregon, South Dakota, Tennessee, Washington, and Wyoming.  League of Women Voters, 178 A.3d at 808 n.69, 813 n.71 (quoting PA. CONST. art. I, § 5).  The Pennsylvania Supreme Court in League of Women Voters did not acknowledge or even mention either New Hampshire or Part I, Article 11.  See id.

Without providing any evidence of the historical context in which New Hampshire adopted and amended Part I, Article 11, the dissent instead relies on selective bits of history from two other states — Pennsylvania and North Carolina — set forth in League of Women Voters, interpreting the Pennsylvania Constitution's "free and equal" provision, and in Harper I, interpreting the North Carolina Constitution's provision that "[a]ll elections shall be free." See PA. CONST. art. I, § 5; N.C. CONST. art. I, § 10. The dissent borrows those courts' interpretations of the historical context of those states' constitutional provisions to support its conclusion that the "essential meaning" of Part I, Article 11 is to "[a]void[] the manipulation of districts that dilute[] votes for electoral gain." (Quotation omitted.) In doing so, the dissent does not explain how or why Pennsylvania's "unique history" relied on by the Pennsylvania Supreme Court reflects New Hampshire's history. League of Women Voters, 178 A.3d at 804.[3]

Similarly, the dissent disregards the comprehensive historical account of North Carolina set forth in Harper III that led that court to reconsider and reject its earlier determination that "free" meant that "those in power shall not attain 'electoral advantage' through the dilution of votes." Harper I, 868 S.E.2d at 541; Harper III, 886 S.E.2d at 439. That detailed account of both colonial and English history shows that, based on its plain language and historical context, North Carolina's free elections clause should properly be interpreted as meaning that elections shall be "free from interference and intimidation" — concerns not implicated by partisan-gerrymandering claims. Harper III, 886 S.E.2d at 438-39.

Furthermore, we note that as a practical consequence of the dissent's expansive interpretation that Part I, Article 11 "'mandates clearly and unambiguously, and in the broadest possible terms, that all elections held in this State must be free and that every inhabitant of a certain age must have an equal right to vote,'" our judiciary "would [be] embroil[ed]" in every local election across the state. Harper III, 886 S.E.2d at 427. Under the dissent's construction of Part I, Article 11, our courts would need to determine whether each of those elections provided each member of the relevant local electorate an equal opportunity to translate their partisan ideology into representation. Perhaps for this very reason, the dissent does not identify any valid authority

---

[3] The dissent likewise fails to acknowledge how the Supreme Court's decision in Rucho v. Common Cause — that there is "no plausible grant of authority" for judicial oversight of partisan gerrymandering under the Federal Constitution — undermines the precedential value of congressional redistricting cases like League of Women Voters v. Commonwealth and Grisham v. Van Soelen, No. S-1-SC-39481, 2023 WL 6209573, at *11-13 (N.M. Sept. 22, 2023). Rucho v. Common Cause, 139 S. Ct. 2484, 2507 (2019); see also Moore v. Harper, 143 S. Ct. 2065, 2088-90 (2023) (explaining that, in congressional redistricting cases, the Supreme Court has "an obligation to insure that state court interpretations of [state] law do not evade federal law").

from any state supreme court that has applied the standard it proposes in a dispute involving state district maps.

The dissent expressly acknowledges that the standard it would use for determining a claim of partisan gerrymandering is based on pre-Rucho case law adjudicating claims of racial gerrymandering. To put a fine point on that acknowledgement, the standard proposed by the dissent has already been considered and rejected because it does not present a manageable standard in this context. See Rucho, 134 S. Ct. at 2497. As the Supreme Court explained, "[u]nlike partisan gerrymandering claims, a racial gerrymandering claim does not ask for a fair share of political power and influence, with all the justiciability conundrums that entails." Id. at 2502. Rather, it asks "for the elimination of a racial classification. A partisan gerrymandering claim cannot ask for the elimination of partisanship." Id.

"Essentially, the Rucho Court struggled to know whether there can ever be 'too much' of a legitimate legislative purpose in the process of state law-making." Rivera v. Schwab, 512 P.3d 168, 183 (Kan. 2022). The Court's answer, "in sum, was—maybe, but without codified law to guide judges in knowing when too much partisanship becomes so unfair as to offend constitutional principles, the question cannot be answered." Id. Although the dissent avers that it has identified a manageable standard "'through which future litigants can create more refined standards to evaluate'" claims of partisan gerrymandering, we are unable to glean from its generalized musings any clarity on the dispositive question of how much partisan dominance is too much. The dissent does not explain how to determine when its proposed "standard" has been met because it too cannot answer that foundational question.[4] Rather, it would simply remand to the trial court and task it with establishing the outside parameters of constitutional gerrymandering without any guidance.

Contrary to the dissent's characterization, we do not decline to exercise jurisdiction over alleged constitutional violations because we think the task is "beyond judicial capabilities." We simply recognize the proper limits of judicial reach into political disputes — "we have no commission to allocate political power and influence in the absence of a constitutional directive or legal standards to guide us in the exercise of such authority." Rucho, 139 S. Ct. at

---

[4] As with any other proposed standard for measuring partisan gerrymandering, the dissent does not explain how its standard can measure or predict a district map's influence on election results in a state, like New Hampshire, that has a higher percentage of registered voters who are "[u]naffiliated" than voters who are registered under either of the major political parties. See https://independentvoterproject.org/voter-stats/nh (last visited Nov. 14, 2023).

23

2508.  In this "rare circumstance," it is our duty "to say 'this is not law.'"  Id.[5]  Because the question before us is not justiciable, it is not ours to review.  Baines, 152 N.H. at 128.

VIII

In the absence of established limitations on partisan gerrymandering as adopted by statute or by constitutional amendment, we hold that the issue presented poses a non-justiciable political question.  Accordingly, we affirm.

Affirmed.

MACDONALD, C.J., and HANTZ MARCONI, J., concurred; HICKS and BASSETT, JJ., dissented.

HICKS and BASSETT, JJ., dissenting.  The plaintiffs are voters who assert that their fundamental constitutional rights to "fairly and equally participat[e] in the political process," "band together" with others to advance political beliefs, and "freely choose" their political representatives have been infringed upon because of excessive partisan gerrymandering.  This case is about whether the plaintiffs can have their day in court.  Our colleagues have ruled that they cannot.  For the first time, this court has declined to exercise jurisdiction over alleged constitutional violations on the ground that it cannot discern manageable standards for resolving them in the text of the constitution, or, in Justice Kagan's words, "because it thinks the task beyond judicial capabilities."  Rucho v. Common Cause, 139 S. Ct. 2484, 2509 (2019) (Kagan, J., dissenting).  We disagree that this case is incapable of being adjudicated, and therefore, respectfully, dissent.

I.  Introduction

"Voting is of the most fundamental significance under our constitutional structure."  N.H. Democratic Party v. Secretary of State, 174 N.H. 312, 321 (2021) (quotation and brackets omitted).  Indeed, "'[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined.'"  Below v. Secretary

---

[5] The dissent's invocation of Daniel Webster takes his statement, "the right to choose a representative is every man's portion of sovereign power," completely out of context.  Luther v. Borden, 48 U.S. (7 How.) 1, 30 (1849).  In Luther, Daniel Webster argued that a dispute between Rhode Island's elected government and a renegade band that acted to vote to form a new constitution was not justiciable under the Guaranty Clause of the Federal Constitution because it presented a political dispute.  Id. at 30, 32-33, 35-36.  The Court agreed with Webster, concluding that, because it rested with Congress "to decide what government is the established one in a State" and "not in the courts," it was a matter for the people through their elected representatives to decide.  Id. at 32-33, 42-43.

of State, 148 N.H. 1, 2 (2002) (per curiam) (Below I) (quoting Wesberry v. Sanders, 376 U.S. 1, 17 (1964)); see Akins v. Sec'y of State, 154 N.H. 67, 71 (2006) (recognizing that the right to vote is a fundamental right). "[R]epublican liberty" demands "not only, that all power should be derived from the people; but, that those entrusted with it should be kept in dependence on the people." 2 The Federalist No. 37 at 4 (James Madison) (J. & A. McLean eds. 1788). Thus, "the true principle of a republic is, that the people should choose whom they please to govern them." The Debates and Proceedings of the Constitutional Convention of the State of New York Assembled at Poughkeepsie on the 17th June, 1788 A Fac-simile Reprint of an Original Copy in The Adriance Memorial Library at 40 (1905). The right to choose one's representative is particularly important under the New Hampshire Constitution, which begins with an express commitment to popular self-rule. See N.H. CONST. pt. I, arts. 1 ("all government, of right, originates from the people"), 8 ("All power residing originally in, and being derived from, the people . . . .").[6]

Partisan gerrymandering defies "the core principle of republican government, namely, that the voters should choose their representatives, not the other way around." Arizona State Legislature v. Arizona Independent Redistricting Comm'n, 576 U.S. 787, 824 (2015) (quotations omitted). It threatens the democratic process by "enabl[ing] a party that happens to be in power at the right time to entrench itself there for a decade or more, no matter what the voters would prefer." Gill v. Whitford, 138 S. Ct. 1916, 1940 (2018) (Kagan, J., concurring).[7]

In Rucho, writing for a majority of the Supreme Court, Chief Justice Roberts recognized that "[e]xcessive partisanship in districting leads to results that reasonably seem unjust" and is "incompatible with democratic principles." Rucho, 139 S. Ct. at 2506 (quotation omitted).[8] Neither the majority nor the defendant distances itself from these indisputable truths as stated by Chief Justice Roberts.

---

[6] The New Hampshire Constitution, like other state constitutions, "start[s] by protecting individual rights." Jeffrey S. Sutton, Who Decides? States as Laboratories of Constitutional Experimentation 124 (2022). "With the federal constitution," by contrast, "almost all of the enumerated individual rights come after the 1789 Constitution, starting with the Bill of Rights in 1791 and supplemented by other amendments after that." Id.

[7] Indeed, "the evils of gerrymandering seep into the legislative process itself." Gill v. Whitford, 138 S. Ct. 1916, 1940 (2018) (Kagan, J., concurring). The consequences of "excessive partisan gerrymandering" include "indifference to swing voters and their views; extreme political positioning designed to placate the party's base and fend off primary challenges; the devaluing of negotiation and compromise; and the impossibility of reaching pragmatic, bipartisan solutions to the nation's problems." Id. (Kagan, J., concurring).

[8] At oral argument, counsel for the defendant agreed that it would be inconsistent with democratic principles if 20% of the electorate could elect a supermajority.

25

The majority concludes, however, that the plaintiffs' claims raise a non-justiciable political question because of the lack of a discernible and manageable standard in the text of the constitutional provisions upon which the plaintiffs rely. We have never before declined to decide a constitutional question on this ground and should not do so now.

"Where important rights are involved, the impossibility of full analytical satisfaction is reason to err on the side of caution." Vieth v. Jubelirer, 541 U.S. 267, 311 (2004) (Kennedy, J., concurring). And, in this case, the right at issue, the right to choose a representative, is, as Daniel Webster once said, "every man's portion of sovereign power." Luther v. Borden, 48 U.S. (7 How.) 1, 30 (1849) (statement of counsel); see New York City Bd. of Estimate v. Morris, 489 U.S. 688, 693 (1989) (relying upon Daniel Webster quotation from Luther and explaining that "in this country the people govern themselves through their elected representatives"); Burling v. Speaker of the House, 148 N.H. 143, 144, 153, 160 (2002) (per curiam) (relying upon Daniel Webster quotation from Luther and rejecting the redistricting plans submitted by the parties in favor of a court-devised plan intended to insure that "'the vote of any citizen is approximately equal in weight to that of any other citizen in the State'" (quoting Reynolds v. Sims, 377 U.S. 533, 579 (1964)).

"[I]t is not necessary to adopt a full-blown theory of fairness, furnishing a precise measure of harm caused by divergence from the ideal in each case" in order "[t]o devise a judicial remedy" for "the worst cases of gerrymandering." Vieth, 541 U.S. at 354 (Souter, J., dissenting). Drawing district boundaries to entrench a party in power and dilute the votes of citizens favoring the party's rival is not "a 'necessary evil' that, for lack of judicially manageable standards, the Constitution," and this court, "inevitably must tolerate." Id. at 355 (Breyer, J., dissenting).

"The expectation that newly announced standards will be fleshed out over time is nothing new. That very process in our common-law tradition allows legal doctrine to work itself pure." Michael Gentithes, Gobbledygook: Political Questions, Manageability, & Partisan Gerrymandering, 105 Iowa L. Rev. 1081, 1111 (2020). "Justiciability . . . should not solely be based upon whether achieving doctrinal clarity may take years or even decades." Id. "Extreme partisan gerrymandering is too dangerous" to our democracy "to be dismissed as impractical to adjudicate." Id. at 1124. Our fundamental, constitutional duty to "say what the law is," Saloshin v. Houle, 85 N.H. 126, 131 (1931), requires that we specify "the parameters through which future litigants can create more refined standards to evaluate the issue," Gentithes, supra at 1124-25. That is what we have set out to do in this dissent.

26

II. Analysis

A. The Political Question Doctrine

"Whether a controversy is nonjusticiable presents a question of law, which we review de novo." Burt v. Speaker, N.H. House of Representatives, 173 N.H. 522, 525 (2020) (quotation omitted). "The nonjusticiability of a political question derives from the principle of separation of powers." Id. (quotation omitted). This principle is set forth in Part I, Article 37 of our State Constitution, which provides:

> In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity.

N.H. CONST. pt. I, art. 37.

"The justiciability doctrine prevents judicial violation of the separation of powers by limiting judicial review of certain matters that lie within the province of the other two branches of government." Burt, 173 N.H. at 525 (quotation omitted). "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the State Constitution." Id. (quotations and brackets omitted); see Baker v. Carr, 369 U.S. 186, 211 (1962).

Cases that raise non-justiciable political questions have the following characteristics:

> "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

<u>Baines v. N.H. Senate President</u>, 152 N.H. 124, 129 (2005) (quoting <u>Baker</u>, 369 U.S. at 217).

B. <u>The Plaintiffs' Claims</u>

The plaintiffs have alleged that the legislature's reapportionment plans for the state senate and executive council districts constitute extreme partisan gerrymandering and, therefore, violate their rights to free and equal elections, <u>see</u> N.H. CONST. pt. I, art. 11, equal protection, <u>see</u> N.H. CONST. pt. I, arts. 1, 10, 12, and free speech and association, <u>see</u> N.H. CONST. pt. I, arts. 22, 32. Specifically, the plaintiffs, all Democrats who intend to support Democratic candidates, allege that they are registered to vote in a district where the legislature has either intentionally "packed" or "cracked" Democratic voters. In districts where Democratic voters are "packed," they are concentrated "into a small number of districts where they form overwhelming majorities, minimizing their impact—and maximizing Republican voters' impact—in neighboring districts." In districts where Democratic voters are "cracked," they are "distribut[ed]" among districts "in such a way that those districts are dominated by Republican voters" and Democratic voters "form an ineffective minority and have little or no chance of electing Democratic candidates."

As an example of "packing," the plaintiffs point to the redistricting of executive council districts 1 and 2:

The most significant changes made by the General Court in enacting the 2022 Executive Council Plan concern Districts 1 and 2. In the prior Executive Council map, District 1 logically encompassed the entire North Country—including all of Coös, Grafton, and Carroll Counties—as well as northern portions of Sullivan, Merrimack, Belknap, and Strafford Counties. By contrast, the 2022 Executive Council Plan draws District 1 to cover only the eastern side of the state, encompassing most (but not all) of Coös County, all of Carroll County, and then stretching all the way south to Dover and Durham. Meanwhile, District 2—which previously snaked horizontally through the southern half of the state—now runs vertically along the western border of the state, stretching all the way from the southeast corner of the state through Grafton County. But, in a blatant attempt to pack District 2 with Democratic voters, the General Court extended parts of the district eastward to pick up Democratic strongholds in Cheshire, Hillsborough, and Merrimack Counties. The result is a district [that] resembles a scrawled "E."

. . . .

28

By further packing District 2 with Democratic voters, the General Court made District 1, which was previously a competitive district, into a safe Republican seat.

The plaintiffs contend that executive council districts 3 and 4 exemplify "cracking." They allege that district 3 pairs "Democratic-leaning Newmarket, Exeter, and Portsmouth" with "the heavily Republican areas to the southwest," thus, "neutralizing the strength of its Democratic voters," and that district 4 pairs "the Democratic strongholds of Manchester and Lee" with "heavily Republican areas farther to the north," but "carefully exclud[es] . . . Democratic-leaning Concord." The plaintiffs contend that, as a result, both districts 3 and 4 "are safe Republican seats."

The plaintiffs contend that the "Executive Council Plan will result in Republicans entrenching their control of that body—with 80% of its seats— even though, since 2016, Republicans have received just over half of all votes in statewide elections." They assert that, under the redistricting plan, "Republicans can win 80% of the Executive Council's seats even if they win less than half of the statewide vote."

The plaintiffs aver that the alleged "systematic[] packing and cracking [of] Democratic voters" dilutes their voting strength, "stymie[s] their ability to transform their votes into representation," and diminishes "their ability to band together and elect candidates of their choice." The plaintiffs further allege that the redistricting plans for the state senate and executive council districts were carefully tailored intentionally to entrench Republican control of those bodies.

On appeal, the plaintiffs contend that their fears about the partisan effect of the redistricting plans were realized in the 2022 election. They ask this court to take judicial notice of the 2022 election results, which, they contend, "confirm the [plans'] extreme artificial pro-Republican bias." The plaintiffs state that "[d]espite receiving less than 50% of the total votes in all Senate races, Republicans captured 58% of Senate seats; and despite receiving less than 50% of the total votes in all Executive Council races, Republicans captured 80% of Executive Council seats."

C. The Defendant's Arguments

1. Judicially Manageable Standards

The defendant principally argues that the plaintiffs' claims are not justiciable because the State Constitution fails to provide discoverable or manageable standards for judicial intervention. We disagree. The standard for which the plaintiffs advocate, and that we would adopt, is grounded in Part I, Article 11 of the State Constitution, which provides, in pertinent part: "All

elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election."  N.H. CONST. pt. I, art. 11.

"When interpreting a constitutional provision, we will look to its purpose and intent, bearing in mind that we will give the words in question the meaning they must be presumed to have had to the electorate when the vote was cast."  Petition of Below, 151 N.H. 135, 139 (2004) (per curiam) (Below II) (quotation omitted).  Reviewing the history of the constitution and its amendments is often instructive and, by doing so, "the court endeavors to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the surrounding circumstances."  Baines, 152 N.H. at 133 (quotation omitted).  "The language used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted."  Id. at 133-34 (quotation omitted).

At its inception in 1784, Article 11 provided: "All elections ought to be free, and every inhabitant of the State, having the proper qualifications, has equal right to elect and be elected into office."  Fischer v. Governor, 145 N.H. 28, 32 (2000) (quotation omitted).  "The 1784 version of this article was based on the 1780 Massachusetts Constitution, Part I, Article IX."  Lawrence Friedman, The New Hampshire State Constitution 55 (2015).  The principal author of the Massachusetts Constitution of 1780, John Adams, derived the commonwealth's Declaration of Rights from several sources.  See Robert J. Taylor, Construction of the Massachusetts Constitution, 90 Proc. of Am. Antiquarian Soc'y 317, 324, 326, 330-31, 344 (1980).  "Virginia's Bill of Rights, . . . was influential but less directly so than Pennsylvania's . . . ."  Id. at 330.  "The subjects of Adams's first twenty articles follow pretty much the order of Pennsylvania's first sixteen, and often whole phrases are borrowed."  Id. at 330-31.  "All these American declarations owed a debt to great English state papers," including the English Bill of Rights of 1689.  Id. at 331.

The language of Part I, Article 11 "was broad, granting the right to vote and to be elected to all inhabitants of New Hampshire with 'proper qualifications.'"  Fischer, 145 N.H. at 32; see 1 Samuel Johnson, A Dictionary of the English Language (6th ed. 1785) (defining the verb "to elect" as "[t]o choose for any office"; defining the adjective "equal" as "[l]ike another in bulk, excellence, or any other quality that admits comparison; neither greater nor less; neither worse nor better"; and defining the adjective "free" as "[a]t liberty" and "[u]ncompelled; unrestrained").

Since its original enactment in 1784, Part I, Article 11 "has been amended eight times, including two separate amendments that were adopted in

1968." Friedman, <u>supra</u> at 55; <u>see</u> <u>Fischer</u>, 145 N.H. at 33-37 (discussing, in detail, the 1912, 1942, and 1976 amendments to Part I, Article 11). Part I, Article 11 was first amended in 1903 "to add a literacy test for voting and holding office." Friedman, <u>supra</u> at 55. "Voters and office holders were required to be able to write and to read the constitution in the English language," although persons with physical disabilities and those 60 years old or older as of January 1904 were exempt from this requirement. <u>Id</u>. "The literacy requirement in Part I, Article 11 . . . was not removed until 1968." <u>Id</u>. at 24.

Part I, Article 11 was next amended in 1912 when "a sentence was added which prohibited any person from voting . . . who had been convicted of treason, bribery, or willful violation [of] the election laws." <u>Id</u>. at 55. "In 1942, a provision was added to allow absentee voting in biennial or state elections and city elections," and in 1956, "[t]he absentee voting right was expanded . . . to also apply to primary elections." <u>Id</u>.

In 1968, Part I, Article 11 was amended to preclude individuals from being denied the right to vote because of nonpayment of taxes, and to remove the provision allowing persons who were 60 years of age or older as of January 1, 1904, to vote, "which was obsolete because it could only have applied to persons over 120 years old." <u>Id</u>.

In 1976, as a result of the 1974 Constitutional Convention, Part I, Article 11 was amended primarily to lower the voting age to 18, in conformity with the Twenty-Sixth Amendment to the Federal Constitution. <u>See id</u>. "Part I, Article 11 was amended for the last time in the twentieth century in 1984 to require that voting registration and polling places be easily accessible to disabled persons." <u>Id</u>. at 25.

Part I, Article 11 now provides:

All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election. Every person shall be considered an inhabitant for the purposes of voting in the town, ward, or unincorporated place where he has his domicile. No person shall have the right to vote under the constitution of this state who has been convicted of treason, bribery or any willful violation of the election laws of this state or of the United States; but the supreme court may, on notice to the attorney general, restore the privilege to vote to any person who may have forfeited it by conviction of such offenses. The general court shall provide by law for voting by qualified voters who at the time of the biennial or state elections, or of the primary elections therefor, or of city elections, or of town elections by

official ballot, are absent from the city or town of which they are inhabitants, or who by reason of physical disability are unable to vote in person, in the choice of any officer or officers to be elected or upon any question submitted at such election. Voting registration and polling places shall be easily accessible to all persons including disabled and elderly persons who are otherwise qualified to vote in the choice of any officer or officers to be elected or upon any question submitted at such election. The right to vote shall not be denied to any person because of the nonpayment of any tax. Every inhabitant of the state, having the proper qualifications, has an equal right to be elected into office.

N.H. CONST. pt. I, art. 11.

The current wording of the first sentence of Part I, Article 11, changing "ought to be" to "are" is a result of the amendments made to this provision following the 1974 Constitutional Convention. See Journal of Constitutional Convention 521-23 (June 26, 1974); Manual for the General Court 687-88 (1977). The change from "ought to be" to "are" reflected an intent merely to simplify the wording. Journal of Constitutional Convention 177 (June 12, 1974). The amendment, once ratified, also separated the voting and candidacy clauses and put them in separate sentences. Fischer, 145 N.H. at 36. Thus, the first sentence of Article 11 provides in part: "All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election;" and the last states: "Every inhabitant of the state, having the proper qualifications, has an equal right to be elected into office." N.H. CONST. pt. I, art. 11.

None of the amendments to Part I, Article 11 altered its essential meaning, which is that elections must be "free" and all citizens meeting certain qualifications must have an "equal" right to vote. Although the requisite voter qualifications have changed over time, the directive that elections be "free" and that all voters meeting those qualifications have an "equal" right to vote has remained constant. At its inception and still, Part I, Article 11 "mandates clearly and unambiguously, and in the broadest possible terms, that all elections" held in this State must be "free" and that every qualified voter must have an "equal" right to vote. League of Women Voters v. Commonwealth, 178 A.3d 737, 803-04 (Pa. 2018) (describing the analogous clause in the Pennsylvania Constitution);[9] N.H. CONST. pt. I, art. 11; see Taylor, supra at

---

[9] The majority contends that the Pennsylvania provision is not analogous to Part I, Article 11 of the New Hampshire Constitution. We disagree. Compare PA. CONST. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."), with N.H. CONST. pt. I, art. 11 ("All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election.")

330-31 (explaining the relationship between the early constitutions of Pennsylvania and Massachusetts).  The references to "all elections" being "free" and every inhabitant having an "equal" right to vote is "indicative of the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted" and "conducted in a manner which guarantees, to the greatest degree possible, a [qualified] voter's right to equal participation in the electoral process for the selection of his or her representatives in government."  League of Women Voters, 178 A.3d at 804 (discussing Pennsylvania's free and equal elections clause).  Thus, like the Pennsylvania Constitution, Part I, Article 11 "guarantees our citizens an equal right, on par with every other citizen, to elect their representatives.  Stated another way, the actual and plain language" of Part I, Article 11, "mandates that all [qualified] voters have an equal opportunity to translate their votes into representation."  Id.

This interpretation is consistent with the historical purpose of Part I, Article 11.  Part I, Article 11 was derived from a clause in the English Bill of Rights of 1689, a product of the Glorious Revolution of 1688.  See Harper v. Hall, 868 S.E.2d 499, 540 (N.C. 2022) (referring to Virginia's free elections clause), overruled by Harper v. Hall, 886 S.E.2d 393 (N.C. 2023); Orr v. Quimby, 54 N.H. 590, 613-14 (1874) (Doe, J., dissenting) ("All or nearly all the guaranties and prohibitions of our bill of rights were supposed to be necessary here because they had been necessary in England.  Many of them were originally taken almost literally from English documents . . . where they had been recorded, after violent controversies, as authoritative acknowledgments and affirmations of ancient English liberties."); cf. Hughes v. Speaker, N.H. House of Representatives, 152 N.H. 276, 291 (2005) (referring to New Hampshire's Speech and Debate Clause).  The English Bill of Rights of 1689 provided "election of members of parliament ought to be free."  Harper, 868 S.E.2d at 540 (quotation omitted).  "That provision of the 1689 English Bill of Rights was adopted in response to the king's efforts to manipulate parliamentary elections by diluting the vote in different areas to attain electoral advantage, leading to calls for a free and lawful parliament by the participants of the Glorious Revolution."  Id. (quotations omitted).  "Avoiding the manipulation of districts that diluted votes for electoral gain was, accordingly, a key principle of the reforms following the Glorious Revolution."  Id.  Part I, Article 11, thus, "reflects the principle of the Glorious Revolution that those in power shall not attain electoral advantage through the dilution of votes."  Id. at 541.

Partisan gerrymandering violates Part I, Article 11 because it

dilutes the votes of those who in prior elections voted for the party not in power to give the party in power a lasting electoral advantage.  By placing voters preferring one party's candidates in

33

districts where their votes are wasted on candidates likely to lose (cracking), or by placing such voters in districts where their votes are cast for candidates destined to win (packing), [the votes of members of] the non-favored party[] . . . are diluted. It is axiomatic that a diluted vote is not an equal vote, as all voters do not have an equal opportunity to translate their votes into representation.

League of Women Voters, 178 A.3d at 814 (analyzing Pennsylvania's Free and Equal Elections Clause).[10] We would find such a claim cognizable under Part I, Article 11.[11] See Grisham v. Van Soelen, No. S-1-SC-39481, 2023 WL 6209573, at *8 (N.M. Sept. 22, 2023) ("A partisan gerrymander by its very nature results in vote dilution."); Harper, 886 S.E.2d at 462 (Earls, J., dissenting) (explaining that "when the voting strength of a particular group of voters is artificially diluted based purely on their political preferences, they are deprived of their fundamental right to vote on equal terms, among other constitutional rights" (quotation and citation omitted)).

In effect, "partisan gerrymandering is . . . indistinguishable from malapportionment," which is "the practice of inequitably apportioning representatives, allowing certain voters to wield more influence than others." Harper, 886 S.E.2d at 459 (Earls, J., dissenting). "The only practical difference is that, rather than diluting votes based on where a voter happens to reside,

---

[10] The majority focuses upon Harper, 868 S.E.2d 499, without acknowledging that the plaintiffs also rely heavily upon League of Women Voters, 178 A.3d 737, decided in 2018 by the Pennsylvania Supreme Court. Notably, Pennsylvania, like New Hampshire, has a free and equal elections clause, whereas the concept of an equal election or vote is nowhere to be found in the North Carolina Elections Clause. Compare PA. CONST. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."), with N.C. CONST. art. I, § 10 ("All elections shall be free.")

[11] The majority does not analyze substantively the state constitutional provisions upon which the plaintiffs rely. Rather, the majority quotes the constitutional provisions at issue and concludes, based upon their "plain" language — language that the majority neither interprets nor explains — that the provisions contain "no judicially discernible and manageable standards for adjudicating claims of extreme partisan gerrymandering." Given the majority's approach, we have confined our analysis to plaintiffs' claims under Part I, Article 11. Doing so is fully consistent with our general practice of deciding constitutional questions only when necessary. See Doe v. Attorney General, 175 N.H. 349, 355 (2022). In addition, we do not opine about whether the plaintiffs' claims are also cognizable under the equal protection or free speech and association provisions of the State Constitution. Nor do we opine as to whether, as the plaintiffs argue, those state constitutional provisions are more protective of individual rights than the parallel provisions of the Federal Constitution in the partisan gerrymandering context. See State v. Ball, 124 N.H. 226, 233 (1983) ("Although in interpreting the New Hampshire Constitution we have often followed and agreed with the federal treatment of parallel provisions of the federal document, we never have considered ourselves bound to adopt the federal interpretations."); Sutton, supra at 125 (observing that "state courts remain free . . . to adopt their own interpretations of similarly worded constitutional guarantees").

partisan gerrymandering dilutes votes based on whom an individual happens to vote for." Id. (Earls, J., dissenting) (quotation, brackets, and citation omitted). "Thus, as with malapportionment, partisan gerrymandering deprives voters of 'substantially equal voting power,'" in violation of Part I, Article 11. Id. at 459-60 (Earls, J., dissenting) (referring to North Carolina's Equal Protection Clause).

Part I, Article 11's abstract standard of "free" and "equal" elections is judicially discoverable and manageable and renders the plaintiffs' claim justiciable. See Baker, 369 U.S. at 226. We, like the United States Supreme Court, have "constructed innumerable legal tests to operationalize [similarly] vague and general constitutional commands." G. Michael Parsons, Gerrymandering & Justiciability: The Political Question Doctrine After Rucho v. Common Cause, 95 Indiana L. Jour. 1295, 1346 (2020) (hereinafter Parsons, Gerrymandering & Justiciability). "One need only examine the litany of case law either interpreting the broad language of the due process or equal protection clauses or establishing standards on which to invoke the first amendment right of free speech" for examples. Id. (quotation omitted); see, e.g., Mathews v. Eldridge, 424 U.S. 319, 335 (1976) (creating balancing test of three factors to decide whether a party has been deprived of procedural due process); Royer v. State Dep't of Empl. Security, 118 N.H. 673, 678 (1978) (adopting Supreme Court's balancing test); Lennartz v. Oak Point Assocs., 167 N.H. 459, 462-63 (2015) (referring to the rational basis test, intermediate scrutiny, and strict scrutiny standards by which courts review equal protection challenges and explaining the intermediate scrutiny standard in detail).

Similarly, in the search and seizure context, both this court and the United States Supreme Court have construed the general protection in the State and Federal Constitutions, respectively, against "unreasonable" searches and seizures to relate to an expectation of privacy. See State v. Goss, 150 N.H. 46, 48-49 (2003); Katz v. United States, 389 U.S. 347, 353 (1967). In Goss, 150 N.H. at 49, we adopted the two-part test from Justice Harlan's concurrence in Katz for determining whether there is a reasonable expectation of privacy: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" Katz, 389 U.S. at 361 (Harlan, J., concurring). Whether an expectation of privacy is "one that society is prepared to recognize as 'reasonable'" is hardly a bright-line rule. Id. (Harlan, J., concurring). Yet, it is the test used by this court and the United States Supreme Court. See Goss, 150 N.H. at 49; Oliver v. United States, 466 U.S. 170, 177 (1984). And, despite using the same test, this court and the United States Supreme Court have reached different conclusions when applying it to the search and seizure of trash. Compare Goss, 150 N.H. at 49-50 (concluding that the defendant's subjective expectation of privacy in trash placed for pick up in black plastic bags is one that society is prepared to recognize as reasonable), with California

v. Greenwood, 486 U.S. 35, 41 (1988) (holding that "society would not accept as reasonable [a] claim to an expectation of privacy in trash left for collection in an area accessible to the public").

Indeed, the Supreme Court found racial gerrymandering claims justiciable two years before adopting the one-person, one-vote standard to measure the burden that districts without equal population have on representational rights. See Baker, 369 U.S. at 226; Reynolds, 377 U.S. at 579. In Baker, the Court found the "[j]udicial standards under the Equal Protection Clause" sufficient to render the plaintiffs' racial gerrymandering claim justiciable. Baker, 369 U.S. at 226. Even the one-person, one-vote standard, adopted two years after Baker, "was at first highly malleable and imprecise, failing to specify just how far from an exact equality of voters per district a state can constitutionally stray." Gentithes, supra at 1115. Over the decade that followed Reynolds, the Supreme Court "slowly establish[ed] a rough mathematical threshold . . . , striking legislative plans where the difference between the largest and smallest districts was greater than ten percent while holding that deviations under that threshold are presumptively permissible unless the plaintiffs provide other evidence of discrimination." Id. (footnotes omitted).

As these examples demonstrate, "[d]octrinal rules and standards have always developed through discrete decisions over time." Parsons, Gerrymandering & Justiciability at 1346. "It is implausible to suggest that partisan gerrymandering is uniquely immune to judicial standards." Id.

To analyze whether the legislature's redistricting plans violate Part I, Article 11, we would use the framework that the New Mexico Supreme Court recently used in Grisham, 2023 WL 6209573, at *13, which is the same framework upon which federal and state courts had converged before Rucho: a three-part test (intent, effects, and causation) to identify the kind of vote-dilution harm that had previously been recognized as a constitutionally-cognizable injury. See Gill, 138 S. Ct. at 1929-31; Rucho, 139 S. Ct. at 2516 (Kagan, J., dissenting); Harper, 868 S.E.2d at 552 (applying strict scrutiny when a plaintiff "demonstrate[s] that the plan makes it systematically more difficult for a voter to aggregate his or her vote with other likeminded voters, thus diminishing or diluting the power of that person's vote on the basis of his or her views"); League of Women Voters, 178 A.3d at 817 (considering "the degree to which neutral criteria," such as "compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts," were "subordinated to the pursuit of partisan political advantage" in congressional redistricting plans); Adams v. DeWine, 195 N.E.3d 74, 85 (Ohio 2022) (deciding that Ohio's constitutional provision barring partisan gerrymandering "does not prohibit a plan from favoring or disfavoring a political party or its incumbents to the

degree that inherently results from the application of neutral criteria, but it does bar plans that embody partisan favoritism . . . not warranted by legitimate, neutral criteria").[12]  Such a test is an "utterly ordinary" standard, "the sort of thing courts work with every day."  Rucho, 139 S. Ct. at 2517 (Kagan, J., dissenting).

This analytical framework is similar to the framework used in racial gerrymandering cases.  "The Fourteenth Amendment prohibits legislatures from engaging in two forms of racial gerrymandering: intentional racial vote dilution . . .  and racial sorting . . . ."  Michael Parsons, Clearing the Political Thicket: Why Political Gerrymandering for Partisan Advantage is Unconstitutional, 24 Wm. & Mary Bill Rts. J. 1107, 1113 (2016) (hereinafter Parsons, Clearing the Political Thicket); see Rogers v. Lodge, 458 U.S. 613 (1982) (intentional race vote dilution); Shaw v. Reno, 509 U.S. 630 (1993) (racial sorting).  "[A] vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities."  Miller v. Johnson, 515 U.S. 900, 911 (1995) (quotation omitted).  By contrast, "the essence" of a racial sorting claim "is that the State has used race as a basis for separating voters into districts."  Id.

To prevail on a claim of unconstitutional racial vote dilution, a plaintiff must demonstrate both discriminatory intent and discriminatory effect.  See Rogers, 458 U.S. at 616-17.  To prevail on a claim of unconstitutional racial sorting, the plaintiff first "must prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."  Cooper v. Harris, 581 U.S. 285, 291 (2017) (quotation omitted).  "That entails demonstrating that the legislature subordinated other factors," such as "compactness" and "respect for political subdivisions," to "racial considerations."  Id. (quotations omitted).[13]  "The

_____

[12]  The majority correctly observes that the state supreme court partisan gerrymandering cases upon which we rely involve congressional redistricting, rather than the redistricting of a state legislative body.  To our knowledge, there are no state supreme court partisan gerrymandering decisions involving the redistricting of a state legislative body.  We draw no inference from the lack of such case law, nor should the majority.  Although the majority apparently concludes that Rucho "undermines the precedential value of congressional redistricting cases" decided by state supreme courts under state constitutions, we disagree.  See Grisham, 2023 WL 6209573, at **11-13 (determining that the New Mexico Equal Protection Clause is not co-extensive with the Federal Equal Protection Clause and that Rucho is not binding precedent on the issue of whether the claim in Grisham presented a non-justiciable political question).

[13] The United States Supreme Court has decided that communities of interest, compactness, contiguity, and respect for political subdivisions constitute "traditional race-neutral districting principles."  Miller v. Johnson, 515 U.S. 900, 916 (1995).  Those factors are not constitutionally required, but rather "are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines."  Shaw v. Reno, 509 U.S. 630, 647 (1993).

plaintiff may make the required showing through direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both." Id. (quotations omitted). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny" such that the burden shifts to the State "to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." Id. at 292 (quotations omitted).

In this case, the plaintiffs raise both vote dilution and sorting claims. They allege that the partisan gerrymandering in this case had a discriminatory intent ("to artificially advantage Republican candidates" and "diminish [the] voting strength" of the plaintiffs, who are registered Democrats who intend to support Democratic candidates) and effect ("[e]ven if more than half of the statewide electorate votes for Democratic candidates, Republicans can still obtain control of both the Senate and Executive Council with large margins"). And, they allege that the redistricting plans for the state senate and executive council intentionally employ irregularly-shaped districts and disregard or subordinate neutral redistricting criteria to entrench Republican control of those bodies.

The plaintiffs maintain that intent can be proved with "direct evidence through official statements and witness testimony of those involved in the [redistricting] process," and with circumstantial evidence, such as expert testimony regarding "the likelihood that a plan's configuration would have resulted from neutral considerations," or "describing how a [plan's] irregular districts contravene the state's logical political geography."

The plaintiffs assert that, to measure the effects of a plan, "parties can offer expert testimony using objective statistical metrics that are well established among political scientists." "[T]he same technologies and data that today facilitate extreme partisan gerrymanders also enable courts to discover them, by exposing just how much they dilute votes." Rucho, 139 S. Ct. at 2517 (Kagan, J., dissenting). As Justice Kagan explained:

> Mapmakers now have access to more granular data about party preference and voting behavior than ever before. County-level voting data has given way to precinct-level or city-block-level data; and increasingly, mapmakers avail themselves of data sets providing wide-ranging information about even individual voters. Just as important, advancements in computing technology have enabled mapmakers to put that information to use with unprecedented efficiency and precision. While bygone mapmakers may have drafted three or four alternative districting plans, today's mapmakers can generate thousands of possibilities at the touch of a key—and then choose the one giving their party maximum

38

advantage (usually while still meeting traditional districting requirements). The effect is to make gerrymanders far more effective and durable than before, insulating politicians against all but the most titanic shifts in the political tides.

Id. at 2513 (Kagan, J., dissenting) (citations omitted). Using the same technologies and data legislative mapmakers use, courts can make "findings about . . . gerrymanders' effects on voters—both in the past and predictably in the future—[that are] evidence-based, data-based, [and] statistics-based." Id. at 2519 (Kagan, J., dissenting).[14]

For instance, some courts have "rel[ied] on what might be called the 'extreme outlier approach.'" Id. at 2518 (Kagan, J., dissenting). Under that approach,

advanced computing technology [is used] to randomly generate a large collection of districting plans that incorporate the State's physical and political geography and meet its declared districting criteria, except for partisan gain. For each of those maps, the method then uses actual precinct-level votes from past elections to determine a partisan outcome (i.e., the number of Democratic and Republican seats that map produces).

Id. (Kagan, J., dissenting). As Justice Kagan described the method:

Suppose we now have 1,000 maps, each with a partisan outcome attached to it. We can line up those maps on a continuum—the most favorable to Republicans on one end, the most favorable to Democrats on the other. We can then find the median outcome— that is, the outcome smack dab in the center—in a world with no partisan manipulation. And we can see where the State's actual plan falls on the spectrum—at or near the median or way out on one of the tails? The further out on the tail, the more extreme the partisan distortion and the more significant the vote dilution.

Id. (Kagan, J., dissenting) (footnote omitted).

There is nothing unmanageable about our proposed analytical framework, which uses predominant legislative intent as the constitutional

---

[14] Whether the plaintiffs' proffered evidence meets their burden would be an issue for the trial court to decide in the first instance, as would deciding the remedy for any violations. Neither issue is properly before us at this juncture. Although the majority posits that New Hampshire's relatively high percentage of unaffiliated voters could affect the analysis, this issue is also not before us. It is an issue that could be considered by the trial court were it to have the opportunity to do so.

threshold.  See Kyle H. Keraga, Answering the Political Question: Demonstrating an Intent-Based Framework for Partisan Gerrymandering, 31 Wm. & Mary Bill Rts. J. 885, 918 (2023).  Predominant legislative intent is "a demanding threshold that . . . function[s] as an effective limiting principle, guaranteeing that courts . . . intervene in the worst partisan gerrymanders, but no others."  Id. at 920-21 (quotation omitted); see Below II, 151 N.H. at 150 (explaining that we "tread lightly" in the redistricting arena so as to demonstrate respect for a coordinate branch of government).  "[A] map drawn with the predominant intent to entrench a party in power or suppress its political adversaries" is unconstitutional, just as a map drawn with the predominant intent to discriminate on the basis of race is unconstitutional.  Keraga, supra at 915-16.  "[T]he essence of a gerrymander is the same regardless of whether the group is identified as racial or political."  Vieth, 541 U.S. at 335 (Stevens, J., dissenting).  "In both contexts, the question is whether a particular group has been unconstitutionally denied its chance to effectively influence the political process."  Keraga, supra at 915.

To the extent that the majority implies by quoting from Rucho at length that "the political science-based tests proposed by the plaintiffs" in this case are "ineffective at predicting future election results," we disagree.  See Rucho, 139 S. Ct. at 2503-04.  The plaintiffs represent that their political science-based tests were remarkably effective at predicting the 2022 election results.  For instance, when they filed their complaint in May 2022, the plaintiffs alleged that the Republicans could "win 80% of the Executive Council's seats even if they [won] less than half of the statewide vote."  The plaintiffs assert, on appeal, that this is exactly what happened in the November 2022 election.  According to the plaintiffs, "despite receiving less than 50% of the total votes in all Executive Council races, Republicans captured 80% of Executive Council seats."

Moreover, contrary to the majority's implicit assertions, the plaintiffs in this case do not ask for proportional representation.  Under Part I, Article 11, "proportionality is not the constitutional baseline."  Harper, 886 S.E.2d at 462 (Earls, J., dissenting) (discussing North Carolina Constitution).  As one commentator has observed, "[t]here is no constitutional right to political proportional representation just as there is no right to racial proportional representation."  Parsons, Clearing the Political Thicket 1163.  Rather, the plaintiffs ask only for their votes to have equal weight.

Nor would deciding the merits of the plaintiffs' Part I, Article 11 claim require a court to make its "own political judgment about how much representation particular political parties deserve—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end."  Rucho, 139 S. Ct. at 2499 (emphasis omitted).  Rather, deciding the claim's merit would require the trial court, in the first instance, and this court

were the decision to be appealed, to do only what New Hampshire courts have done on numerous prior occasions — protect the individual right to vote by limiting the power of the legislature to intentionally dilute the individual's vote when it draws voting districts. See Vieth, 541 U.S. at 354 (Souter, J., dissenting) ("The harm from partisan gerrymandering is . . . a species of vote dilution: the point of the gerrymander is to capture seats by manipulating district lines to diminish the weight of the other party's votes in elections.").

## 2. Political Considerations

The defendant next asserts that the plaintiffs' claims present non-justiciable political questions because the State Constitution "does not clearly, directly, and irrefutably prohibit the Legislature from considering politics when redistricting." See City of Manchester v. Secretary of State, 163 N.H. 689, 697 (2012). The defendant misapprehends the plaintiffs' claims.

The plaintiffs do not contend "that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it." Gaffney v. Cummings, 412 U.S. 735, 752 (1973) (emphasis added). Such a claim would be futile because redistricting "inevitably has and is intended to have . . . political consequences." Id. at 753. "Politics and political considerations are inseparable from districting and apportionment." Id.; see Below II, 151 N.H. at 136 (describing redistricting as "an inherently political process"). As one commentator has noted, "it would be a fool's errand to attempt to remove the politics from politics." Parsons, Clearing the Political Thicket 1163.

Rather, the plaintiffs claim that the challenged plans "'crack' and 'pack' Democratic voters in a manner that can be explained only by an overriding intent to entrench Republican control of" the state senate and executive council "in future elections notwithstanding the will of the voters." (Emphasis added.) They allege that the challenged plans "are so extreme that Republicans can lose the statewide popular vote and still win supermajorities" in both bodies. (Emphases omitted.)

To our mind, there is a critical difference between taking politics "into account," Gaffney, 412 U.S. at 752, which is constitutionally permissible, and entrenching a political party in power by substantially diluting the votes of citizens favoring the party's rival. See Rucho, 139 S. Ct. at 2519, 2523 (Kagan, J., dissenting); Vieth, 541 U.S. at 362 (Breyer, J., dissenting) (explaining that political "gerrymandering that leads to entrenchment amounts to an abuse that violates the [Federal] Equal Protection Clause"); Davis v. Bandemer, 478 U.S. 109, 132 (1986) (plurality) ("[U]nconstitutional discrimination occurs . . . when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole."),

41

<u>abrogated by</u> <u>Rucho</u>, 139 S. Ct. 2484.  "By entrenchment" we mean "a situation in which a party that enjoys only minority support among the populace has nonetheless contrived to take, and hold, . . . power."  <u>Vieth</u>, 541 U.S. at 360 (Breyer, J., dissenting).  "[P]olitical gerrymandering that so entrenches a minority party in power violates basic democratic norms . . . ."  <u>Id</u>. at 361 (Breyer, J., dissenting).

Although we have recognized that "political considerations are tolerated in legislatively-implemented redistricting plans," <u>Burling</u>, 148 N.H. at 156, we have never directly addressed whether entrenching a party in power by substantially diluting the votes of a rival party's supporters is constitutionally permissible.  That said, on more than one occasion, we have observed that legislatively-created districts that "are designed to or would minimize or cancel out the voting strength of racial or <u>political</u> elements of the voting population" are not constitutionally permissible.  <u>Id</u>. at 150 (quotation omitted) (emphasis added); <u>see</u> <u>Opinion of the Justices</u>, 111 N.H. 146, 150-51 (1971); <u>Fortson v. Dorsey</u>, 379 U.S. 433, 439 (1965).

Thus, "[a]lthough some degree of partisan gerrymandering is permissible, <u>egregious</u> partisan gerrymandering can effect vote dilution to a degree that denies individuals their inalienable right to full and effective participation in the political process, and enables politicians to entrench themselves in office as against voters' preferences."  <u>Grisham</u>, 2023 WL 6209573, at *8 (quotations, citation, and brackets omitted).

### 3.  <u>Textual Commitment of Redistricting Task to Legislature</u>

Finally, the defendant contends that the plaintiffs' claims constitute non-justiciable political questions because "[t]he State Constitution commits the authority to determine State Senate and Executive Council districts to the Legislature."  We disagree with the defendant that the textual commitment of redistricting authority to the legislature renders the plaintiffs' claims non-justiciable.  As the majority acknowledges, "concluding that the State Constitution commits to a coordinate branch of government certain exclusive authority does not necessarily end the justiciability inquiry."  <u>See</u> <u>Burt</u>, 173 N.H. at 526.  When, as here, "the question presented is whether or not a violation of a mandatory constitutional provision has occurred, it is not only appropriate to provide judicial intervention, we are mandated to do no less."  <u>Richard v. Speaker of the House of Representatives</u>, 175 N.H. 262, 268 (2022) (quotation omitted).

We agree with the majority that <u>Burt</u> is instructive on this point, but in our view <u>Burt</u> squarely supports our analysis and conclusion.  In <u>Burt</u>, the plaintiffs, who were each members of the New Hampshire House of Representatives, alleged that a house procedural rule prohibiting the carrying

or possession of any deadly weapon in certain areas of the State House, violated their fundamental rights under Part I, Article 2-a of the New Hampshire Constitution. Burt, 173 N.H. at 523. The trial court had dismissed the case on the ground that it lacked subject matter jurisdiction because the issue presented a non-justiciable political question. Id. at 524. We reversed and remanded. Id. We explained that "although claims regarding the legislature's compliance" with its own internal procedural rules "are not justiciable, claims regarding compliance with mandatory constitutional provisions are justiciable." Id. at 526 (citation, quotation, brackets, and ellipsis omitted). We further explained that "[t]he legislature may not, even in the exercise of its absolute internal rulemaking authority, violate constitutional limitations." Id. at 528 (quotation omitted). We remanded to the trial court to address the merits of the plaintiffs' constitutional claim in the first instance. Id. at 529.

Here, as in Burt, although the State Constitution has delegated the redistricting task to the legislature, the plaintiffs' claims are justiciable because they, like the claims in Burt, involve compliance with a mandatory constitutional provision. In Burt, the provision concerned the right to keep and bear arms. See id. at 524. Here, the provision is the right to a free election and an equal right to vote. Although we acknowledged that we previously had adopted a "reasonableness test" for evaluating substantive due process challenges to such regulations, this was not a factor in our analysis of whether the claim presented a non-justiciable political question. See id. at 526-28. Even if it had been a factor, the "reasonableness test" for determining substantive due process challenges is no more text-based than the test we endorse here.

III. Conclusion

Contrary to the defendant's assertions and the majority's analysis, "none of the identifying characteristics of a political question [are] present." Davis, 478 U.S. at 122. The question in this case is of "consistency of state action" with the State Constitution. Baker, 369 U.S. at 226. That question is for this court to resolve, and is not one for "a political branch of government." Id.

"Nor do we risk embarrassment of our government abroad, or grave disturbance at home if we take issue" with the New Hampshire General Court as to the constitutionality of redistricting plans for the state senate and executive council. Id. (footnote omitted). The analytical framework we would adopt (intent, effect, causation) is "well developed and familiar." Id. In short, the plaintiffs' claims are justiciable, and for that reason, we would reverse the trial court's decision to dismiss them and remand for the trial court to adjudicate their merits.

"[T]he need for judicial review is at its most urgent in cases like" this one. Rucho, 139 S. Ct. at 2523 (Kagan, J., dissenting). The majority disagrees, concluding that only when "a standard [is] adopted by statute or by constitutional amendment," will the plaintiffs' claims be justiciable. Were it so simple.

In New Hampshire, "voters are dependent on legislators to make electoral changes." Id. at 2524 (Kagan, J., dissenting). New Hampshire, unlike some other states, lacks an initiative or referendum process. See N.H. CONST. pt. II, art. 100 (providing that a constitutional amendment may be proposed only by either a 3/5 vote of the entire membership of each house of the legislature or by a constitutional convention, and must be approved by 2/3 of the voters); Opinion of the Justices (Tax Plan Referendum), 143 N.H. 429, 445 (1999) (concluding that bill setting forth referendum process enabling people to choose tax plan enacted by legislature to fund constitutionally-adequate public education proposed unconstitutional delegation of power from legislature). And, as Justice Kagan observed, "the chances for legislative reform are slight" because "politicians who benefit from partisan gerrymandering are unlikely to change partisan gerrymandering." Rucho, 139 S. Ct. at 2524 (Kagan, J., dissenting). Reliance upon the ballot box to effect change only makes sense if the democratic process is healthy and embodies the fundamental principles that the right to choose a representative is every person's "portion of sovereign power," Luther, 48 U.S. (7 How.) at 30 (statement of counsel), and that "the vote of any citizen is approximately equal in weight to that of any other citizen in the State," Reynolds, 377 U.S. at 579.

Lest we be misunderstood, we agree that "[b]oth the complexity in delineating state legislative district boundaries and the political nature of such endeavors necessarily preempt judicial intervention in the absence of a clear, direct, irrefutable constitutional violation." City of Manchester, 163 N.H. at 697 (quotation omitted). "It is not our function to decide the peculiarly political questions involved in reapportionment," but it is our function to ensure that elections in New Hampshire remain free and equal. Burling, 148 N.H. at 144 (quotation omitted); see N.H. CONST. pt. I, art. 11. The framers of the State Constitution were concerned about this very problem, recognizing that "[t]he love of Power is so alluring . . . that few have ever been able to resist its bewitching influence," and warning that "[w]herever power is lodged there is constant propensity to enlarge its boundaries." IX Town Papers. Documents and Records Relating to Towns in New Hampshire at 846 (Bouton ed. 1875) (reprinted address by George Atkinson at the Constitutional Convention of 1781). "We find it inconceivable that the framers" of the New Hampshire Constitution "would consider an election in which the entrenched party effectively predetermined the result to be an election" that is free and equal. Grisham, 2023 WL 6209573, at *13 (discussing New Mexico's Equal Protection Clause).

44

Accordingly, when, as in this case, the plaintiffs allege that their votes have been intentionally diluted so as to entrench a party in power — a claim which, if true, constitutes a clear, direct, irrefutable violation of Part I, Article 11's guarantee of a free and equal election — we must adjudicate that claim. See City of Manchester, 163 N.H. at 697. "It is the duty of the judiciary to protect constitutional rights and, in doing so, to support the fundamentals on which the Constitution itself rests." Norelli v. Sec'y of State, 175 N.H. 186, 200 (2022) (quotation omitted). For all of the above reasons, therefore, we respectfully dissent.